**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TRACY S.,[1]                                                   Case No. 1:20-cv-766

        Plaintiff,                                      Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tracy S. filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. § 405(g). Proceeding through counsel, Plaintiff presents several closely-related claims of error for this Court's review. The Commissioner's finding of non-disability will be AFFIRMED because it is supported by substantial evidence in the record as a whole.[2]

**I.  Summary of Administrative Record**

On October 25, 2015, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging she became disabled on October 1, 2015, based upon a combination of a back impairment and psychological impairments including bipolar disorder and anxiety. (Tr. 27). After her claim was denied initially and upon reconsideration, Plaintiff requested

---

[1]The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials. *See* General Order 22-01.
[2]The parties have consented to the jurisdiction of the undersigned magistrate judge. *See* 28 U.S.C. §636(c).

1

an evidentiary hearing before an Administrative Law Judge ("ALJ"). At a hearing held on July 16, 2019, Plaintiff appeared with counsel and gave testimony before ALJ Kevin R. Barnes; a vocational expert ("VE") also testified. On August 28, 2019, the ALJ issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 20-44). The Appeals Council declined further review, leaving the ALJ's decision as the final decision of the Commissioner. Plaintiff then filed this judicial appeal.

Plaintiff was 25 years old on her original alleged disability onset date, and remained in the same "younger individual" age category on the date of the ALJ's decision. She testified she has a high school degree and "some college," (Tr. 61), and previously worked as a resident aide, a patient transporter, and a staffing coordinator (Tr. 41, 61-67). She is married with no children.

The ALJ determined that Plaintiff has severe impairments of "lumbar disc displacement, spondylosis of the lumbar joint, cervicalgia, bipolar disorder, anxiety, borderline personality disorder, and posttraumatic stress disorder (PTSD)." (Tr. 23). The ALJ also noted a history of headaches but found Plaintiff's headache disorder to be nonsevere. (*Id.*) Although Plaintiff argued at the hearing that her impairments were of listing level severity, the ALJ found that none of the impairments, alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appx. 1, such that Plaintiff would be entitled to a presumption of disability. (*Id.*)

Plaintiff does not challenge any of the foregoing findings in this judicial appeal. However, she does challenge the ALJ's assessment of her residual functional capacity ("RFC"). The ALJ determined that Plaintiff could perform light work, subject to the following limitations:

> [S]he is limited to no climbing of ladders, ropes, or scaffolds. The claimant is limited to occasionally climbing of ramps and stairs, balancing, stooping,

crouching, kneeling, and crawling. She should avoid hazardous machinery and unprotected heights. Work is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, and with few, if any, workplace changes. The claimant is further limited to only occasional interaction with the public or coworkers with no tandem tasks.

(Tr. 26).

Based upon her RFC and testimony from the vocational expert, the ALJ concluded that Plaintiff could not perform her prior work but still could perform other jobs that exist in significant numbers in the national economy, including weight recorder, mail clerk, and merchandise marker. (Tr. 43). Therefore, the ALJ determined that Plaintiff was not under a disability. (Tr. 44). Plaintiff urges this Court to reverse, arguing that ALJ erred in evaluating her mental RFC when: (1) he gave "little weight" to the opinions of her treating social worker and her treating nurse practitioner; (2) he gave greater weight to the opinions of non-examining consultants; and (3) he failed to discuss three pieces of evidence that supported her claim. The Court finds no reversible error.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

## B. Plaintiff's Mental RFC is Substantially Supported

The Court discusses Plaintiff's closely related claims, all of which challenge the assessment of her mental RFC, in a different order than presented by Plaintiff. The ALJ limited Plaintiff to "simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, and with few, if any, workplace changes." (Tr. 26). Additionally, he restricted her to "only occasional interaction with the public or coworkers with no tandem tasks." (*Id.*) In support of the mental RFC as determined, the ALJ considered both medical and nonmedical evidence of record. The ALJ also cited to the opinion evidence, giving "partial weight" or "significant weight" to various opinions from "acceptable medical sources," but "little weight" to "other" medical source opinions.

### 1. The ALJ's Evaluation of Non-Opinion Evidence

Although Plaintiff primarily challenges the ALJ's assessment of the opinion evidence, she includes a claim that the ALJ failed to explicitly discuss certain probative evidence in his overall discussion of the record.[3] Specifically, Plaintiff asserts that the following evidence supports greater mental limitations: (1) a statement by consulting psychologist Stephen Halmi that Plaintiff's "prognosis is poor"; (2) "repeated references"

_____

[3]The ALJ's lengthy opinion spans 25 pages, and is replete with detailed discussion of numerous records.

to Plaintiff's "instability"; and (3) "[m]any…positive, objective clinical signs" that support her claim. (Doc. 9 at 11). Plaintiff's argument is unpersuasive.

"It is well settled that '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky v. Com'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. 2006) (additional citation omitted). It is clear that the ALJ considered the entirety of the record as a whole, including the evidence cited by Plaintiff in this appeal.

First, the ALJ specifically discussed Dr. Halmi's consultative report and explained why he afforded Dr. Halmi's opinions only "partial weight." The ALJ noted that Dr. Halmi described Plaintiff as cordial and cooperative. Dr. Halmi reported that despite her deficits, Plaintiff maintained adequate attention and concentration to complete the evaluation, had good recall of remote personal dates and events, and was able to follow simple instructions, understand multi-step instructions, recall six digits forward and three backward, calculate addition and subtraction, and repeat four of four objects immediately after presentation. (Tr. 24-25, 34, 38; *see also* Tr. 527-28, 530). While it is true that the ALJ did not quote Dr. Halmi's statement that Plaintiff's "prognosis is poor," Plaintiff fails to explain how that statement supports any greater mental RFC limitations than those assessed.[4] Given the well-reasoned analysis of the weight given to Dr. Halmi's report, the Court finds no error in the ALJ's failure to quote the "poor prognosis" statement.

The Court also rejects Plaintiff's vague assertions that the ALJ should have included greater discussion of her "instability" or included additional discussion of

---

[4]A statement that a psychological condition is chronic or intractable (i.e., a "poor prognosis") does not necessarily mean that the condition is disabling. In any event, the ALJ included additional mental RFC limitations beyond those endorsed by Dr. Halmi.

"positive clinical signs." Notably, Plaintiff offers no citations to any specific records to support these assertions. In fact, the ALJ incorporated multiple references to her instability and clinical signs, noting her "unstable interpersonal relationships," multiple suicide attempts, panic attacks, frequent crying, mood swings, and periods of intensive treatment. (Tr. 27-28, 32-37). On the whole, however, the ALJ determined that Plaintiff's mental health examination and treatment records were inconsistent with the disabling severity of symptoms alleged.[5] (*See* Tr. 31-37).

In reviewing the large body of evidence discussed by the ALJ, the Court finds the ALJ's analysis to be clear and well-supported. The ALJ discussed records from multiple sources who reported that, despite some deficits, Plaintiff was calm, made good eye contact, had an adequate fund of knowledge, normal speech, normal language, intact associations and average intelligence. In addition, various records reflected her attention was normal, intact, good, adequate or fair, and assessed her long-term, short-term and immediate memory as normal, good or adequate. With respect to memory, she was able to name objects, repeat phrases, and calculate serial 3s. Her thought processes were coherent, linear, logical and goal-directed, and she generally was able to manage her mental impairments well. Other records noted no looseness of associations or flights of ideas. (Tr. 24-26, 32-36, 38-42; *see also* Tr. 403, 411, 430, 703, 767, 772, 788, 820, 822, 824, 861, 927, 998).

Contrary to Plaintiff's argument, the ALJ fully considered periods of increased symptoms, beginning with a brief hospitalization in October 2015 for worsening

---

[5]The ALJ also found multiple inconsistencies between Plaintiff's subjective physical complaints and the record. (Tr. 28-31). Plaintiff does not challenge either the assessment of her physical RFC in this appeal, or the ALJ's negative assessment of the severity of her subjective symptoms (both physical and mental).

depression and suicidal thoughts after her then-husband talked about wanting a divorce. (Tr. 408).  However, in reviewing those records, the ALJ noted Plaintiff's reports at various times that (a) she was doing well enough to work and was not suicidal; (b) she (falsely) told hospital staff she was suicidal in order to be admitted and acquire a prescription for Klonopin; (c) she did not have an significant symptoms or side effects, had no unmanageable mood or anxiety symptoms, and no symptoms of depression at times with only minor anxiety; and (d) she had no abnormalities in thought content or perception. (Tr. 32-33, 36; *see generally* Tr. 402, 430, 436, 767, 772, 1005).

For example, at a follow-up appointment after her October 2015 admission, she reported doing better despite some continuing anxiety and depression, and by November 2015, she rated her symptoms as only 2/10.  (Tr. 402).   She again sought ER treatment with worsening anxiety and suicidal ideation in January 2016, but admitted that she had been taking in excess of her prescribed medication and that she told a social worker that she was suicidal just to gain admission to the hospital and acquire more benzodiazepines. (Tr. 33, 436, 525).  Plaintiff also acknowledged in treatment with her therapist that most of her past suicide attempts were when she was drunk.  (Tr. 33, 1009).   September 2018 ER notes similarly reflected another suicide attempt while intoxicated with a blood alcohol content of .291.  (Tr. 35).  She was also positive for TCH.  (*Id*.)

In October 2018, she participated in a partial hospitalization program and medication management program for approximately one month after explaining that her primary care provider did not want to continue prescribing her medications.  (*Id*.)  She stated she was "really just looking for a psychiatrist."  (Tr. 35,  770).   She began an intensive outpatient program in November 2018 from which she was discharged at the end of December 2018. (Tr. 36).   The ALJ reasoned: "The claimant's relatively good

mental statuses while participating in the partial hospitalization and intensive outpatient programs are not consistent with symptoms quite as intense, persistent, or limiting as alleged, especially considering her notes indicate that participation in the program was because her primary care provider wanted a psychiatrist to take over prescription of medication as opposed to a worsening in her condition."  (*Id.*)

The ALJ also reviewed therapy notes from a new provider in 2019, social worker Tracy Wilson, to whom Plaintiff admitted continued alcohol use.  (Tr. 859, 861).  The same notes reflected increased symptomology corresponding with Plaintiff's drinking and misuse of her medication.  In April 2019, Plaintiff reported wanting to return to work or to volunteer in a nursing home but again indicated it was her physical issues (not mental health) that limit her.  (Tr. 36, 865; *see also* Tr. 309-310).

In addition to the ALJ's extensive discussion of Plaintiff's treatment records, the ALJ discussed Plaintiff's activities of daily living. (Tr. 36).  During the claimed disability period, Plaintiff reported working in a sales position selling scrubs for about 20 hours per week.  (Tr. 25, 34, 37; *see also* Tr. 473, 526).  Plaintiff also shopped, was able to handle money, attend to her hygiene, read, write, and calculate basic math.  (Tr. 24, 25, 34, 37; *see also* Tr. 312, 314-15, 527, 547, 873).  She was able to speak with coworkers and get along with authority figures, had a boyfriend that she saw a couple of times per week, and visited family in Kentucky every two months.  (Tr. 37).  She also spent time out of town dealing with family emergencies and in May 2018, she went on vacation in Hawaii. (*Id.*)  The ALJ pointed out that Plaintiff did not indicate any difficulty understanding, concentrating or completing tasks, and expressly denied having problems learning or performing her jobs, getting along with others, or ever being fired for interpersonal reasons.  (Tr. 24, 25, 27, 34; Tr. 314-15, 526-27, 530).   Based upon the Court's review

of the cited records, the undersigned concludes that the RFC as determined was substantially supported.

### 2. The ALJ's Evaluation of the Medical Source Evidence

Plaintiff's remaining challenges to her mental RFC take exception to the ALJ's evaluation of the opinion evidence, which included four qualified "medical opinions" from "acceptable medical sources" and two opinions from "other" sources.

### a. The Four Acceptable Medical Source Opinions

In determining Plaintiff's mental RFC, the ALJ relied most upon four "acceptable medical source" opinions to which he gave either "partial weight" or "significant weight." The first of these was the July 2016 consultative psychological examination by Dr. Halmi, in which he found mostly mild to not more than moderate limitations. (Tr. 39). Dr. Halmi diagnosed alcohol use disorder "in sustained full remission" based on Plaintiff's self-report, severe anxiolytic use disorder (based upon use of Klonopin), unspecified depressive disorder, panic disorder, and generalized anxiety disorder. (Tr. 529). As discussed above, Dr. Halmi also opined that because Plaintiff's chronic symptoms "have been resistant to treatment… her prognosis is poor." (*Id.*) Despite that prognosis and noted deficits, Dr. Halmi acknowledged that Plaintiff "is working presently and denied having any significant problems completing tasks at work." (Tr. 530). Rather than suggesting that Plaintiff was disabled from all work, he opined that Plaintiff would be limited to understanding and following simple instructions. (*Id.*) The ALJ gave Dr. Halmi's opinion "partial weight," incorporating the limitation to understanding and following simple instructions. However, the ALJ concluded that "additional restrictions are necessary, particularly with regards to social functioning" after considering both Plaintiff's subjective complaints and giving "some slight deference to treating sources." (Tr. 39).

10

In August and October 2016, state agency psychologists Stanley Kravitz and Cynthia Waggoner reviewed the evidence, including Dr. Halmi's report. (Tr. 87-101, 103-115). The ALJ also gave their opinions "partial weight," rejecting the opinion that Plaintiff would require "occasional flexibility with task, break and shift changes with occasional supervision to maintain quality and productively" after concluding that limitation was not well supported and was inconsistent with "her relatively good attention throughout the record." (Tr. 38). At the same time, consistent with his analysis of the opinions of Dr. Halmi, the ALJ concluded that other mental RFC limitations were necessary after giving Plaintiff "the full benefit of the doubt…and …some slight deference to treating sources." (*Id.*)

Plaintiff is critical of even "partial" reliance on the opinions of Drs. Kravitz and Waggoner because their opinions were issued early in the record, before much of Plaintiff's mental health treatment had taken place. But it is not error for an ALJ to rely upon a qualified medical opinion, even when the consulting psychologist has considered an incomplete record, so long as there is "some indication" that the ALJ has "at least considered" the additional records. *Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). Here, the ALJ easily met that standard, adding mental RFC limitations to those endorsed by the non-examining consultants based specifically on later records that the consultants did not have the opportunity to review.

In fact, the ALJ went further to ensure the development of a complete record. Because Plaintiff had no mental RFC opinions from *any* acceptable medical sources, and the only "acceptable medical source" opinions at the time of the hearing dated to 2016, the ALJ elected to send out Plaintiff's records to a medical expert for additional post-hearing review. Following that review, psychologist Mary Buban, Psy.D., opined that

11

Plaintiff has no limitations at all in understanding, remembering or applying information, only mild limitations in concentrating, persisting or maintaining pace, mild to moderate limitations in interacting with others, and moderate limitations in adapting or managing oneself. (Tr. 1265). Functionally, Dr. Buban opined that Plaintiff is able to perform simple, detailed, and previously learned complex tasks at a normal work pace with no fast-paced or production quota demands, and should be limited to jobs with no customer service or tandem teamwork. The ALJ adopted all of the referenced restrictions after giving Dr. Buban's opinions "significant weight." (Tr. 26, 41; *see also* Tr. 1255-68). The ALJ added that "additional restrictions are necessary, particularly with respect to social functioning and complexity of tasks." (Tr. 41).

Plaintiff complains it was error to rely upon Dr. Buban because her summary of the record "left out key details or was outright mistaken." (Doc. 9 at 10). For example, Plaintiff asserts that Dr. Buban "blamed many of Plaintiff's problems on alcohol use, when the record actually reflects that Plaintiff was in sustained remission for most of the alleged period of disability." (*Id*.) The Court finds no error. The conclusion that Plaintiff was in sustained remission came from her self-report to examining providers, including Dr. Halmi, in 2016. Having had the benefit of three years' worth of records following that self-report, Dr. Buban expressed general "Concerns of Alcohol Use and Benzodiazepine overuse/dependence," (Tr. 1256), notwithstanding Plaintiff's "reported remission," in light of evidence of "current use." (Tr. 1259).

For example, Dr. Buban noted that plaintiff was "currently drinking alcohol despite treating source recommendations to abstain," and that hospital records indicated "possible malingering to obtain benzodiazepines," with benzodiazepine dependency "for many years." (Tr. 1265). Dr. Buban points out that Ms. Wilson's report "does not address

the alcohol use/concerns," and that many of Plaintiff's difficulties have been associated with alcohol, with "concern…expressed by treating sources regarding both the benzodiazepine and/or alcohol use while on narcotics." (*Id.*)[6]  Plaintiff offers no evidence that Dr. Buban's summary is inaccurate.   As cited by Dr. Buban and the ALJ, the record confirms that Plaintiff repeatedly used alcohol during the relevant disability period and acknowledged that such use exacerbated her symptoms.  (Tr. 35, 36, 859, 868, 870, 1208, 1212).  This court may not reweigh the evidence.  *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, (6th Cir. 1982).

### b. The ALJ's Analysis of "Other" Medical Sources, Including Plaintiff's Treating Social Worker and Nurse Practitioner

The evidence discussed thus far - including treatment and examination records, nonmedical evidence such as Plaintiff's daily activities, and the medical opinion evidence offered by four acceptable medical sources -  together constitutes substantial evidence to support the mental RFC as determined.  However, Plaintiff urges reversal based upon alleged errors by the ALJ in the assessment of two opinions from treating sources who were not "acceptable medical sources" under the applicable regulations, but instead were deemed "other" sources.  The Court again finds no error.

Beginning in January 2019, Plaintiff began weekly mental health treatment at Pathways.   Shortly before the hearing on July 9, 2019, social worker Tracy Wilson completed a form on which she opined that Plaintiff had "marked" limitations in all four "paragraph B" criteria, including four or more episodes of decompensation.[7] (Tr. 881).  In

---

[6]Apart from explaining that alcohol and drug use was a "concern," Dr. Buban did not otherwise parse out the particular role (if any) that Plaintiff's alcohol and/or drug use played in assessing her mental RFC.

[7]If the ALJ had accepted Ms. Wilson's opinions that Plaintiff had "marked" limitations in all Paragraph B areas, Plaintiff would have met or equaled a Listing at Step 3.  However, the ALJ found "no more than moderate" limitations in any of the Paragraph B areas.  (Tr. 24-26).  Plaintiff does not challenge the ALJ's Step 3 determination in this appeal.

her more detailed assessment of Plaintiff's mental RFC, Ms. Wilson suggested that Plaintiff either was "unable to meet competitive standards" or had "no useful ability to function" in the vast majority of work-related functional areas, and that Plaintiff would be absent from work four or more days per month. (Tr. 39, citing Tr. 879-880, 882). Plaintiff also saw Nurse Practitioner Kathryn Harkenrider, who similarly opined that Plaintiff was functionally disabled from all work, albeit based upon a combination of physical and mental impairments. (Tr. 40; *see generally* Tr. 1246-1253). The ALJ gave each of their opinions "little weight."

Relying on case law that applies to treating physicians, (Doc. 9 at 6-7), Plaintiff argues that the ALJ should have accepted the "disabling" RFC opinions of both Ms. Wilson and Ms. Harkenrider as "treating sources." Plaintiff points out that the opinions of treating physicians are entitled to "controlling weight." (Doc. 9 at 10). But Plaintiff's suggestion[8] that the ALJ erred by failing to give "strong if not controlling" weight to her providers' opinions is a non-starter because the "controlling weight" standard is limited to the medical opinions of "acceptable" treating physicians. *See* 20 C.F.R. § 1527(c)(3).

Relatedly, Plaintiff takes particular issue with the fact that the ALJ discounted the opinions of both Ms. Wilson and Ms. Harkenrider because they are not considered "acceptable medical sources" under applicable regulations, but instead fall within the category of "other" medical sources. *See* 20 C.F.R. § 404.1513(d)(1). However, the ALJ"s consideration of this factor was entirely permissible. The only persons qualified to render "medical opinions" are "acceptable medical sources" who can offer their "judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and

---

[8]*See* Doc. 9 at 8, arguing that the ALJ should have given "strong, if not controlling" weight to the opinions of Ms. Wilson.

prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a) (Evaluating opinion evidence for claims filed before March 27, 2017). Psychologists and physicians are "acceptable medical sources." By contrast, according to applicable regulations and Social Security Rule 06-03p,[9] neither a licensed social worker nor a nurse practitioner is an "acceptable medical source." Therefore, their opinions are not qualified "medical opinions." *See* 20 C.F.R. §§ 404.1513(a); *see also* SSR 06-3p, 2006 WL 2329939, at *2 ("[O]nly 'acceptable medical sources' can give us medical opinions" or "be considered treating sources…whose medical opinions may be entitled to controlling weight.").

Under SSR 06-03p, an ALJ may give less weight to an opinion from an "other" medical source than to the opinion of an "acceptable medical source" on the basis of status:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals."

SSR 06-03p, 2006 WL 2329939, at *5; *see also Miller v. Com'r of Soc. Sec.*, 811 F.3d 825, 838 n.9 (6th Cir. 2016) (holding that distinction was justified, citing SSR 06-3p at **2, 5). Thus, the ALJ's citation to the status of Plaintiff's treating sources was not error.

---

[9]On March 27, 2017, the SSA rescinded SSR 06-03p. See 82 Fed. Reg. 15263 (March 27, 2017). On April 6, 2017, the SSA published a Correction to the Notice of Rescission that changed the effective date to read "Effective Date: March 27, 2017." 82 Fed. Reg 16869 (April 6. 2017). However, "courts within the Sixth Circuit have interpreted the Notice of Rescission and subsequent Correction to mean that SSR 06-03p will continue to apply to claims filed before March 27, 2017." *Fowler v. Kijakazi*, 2021 WL 3621708, at *3 (W.D. Ky. Aug. 16, 2021) (collecting cases).

While glossing over the language in SSR 06-03p that justifies the ALJ's reliance on the status of the "acceptable medical sources" as grounds for giving their opinions greater weight (and conversely, less weight to Ms. Wilson and Ms. Harkenrider), Plaintiff stresses that the "other" source opinions still "should be evaluated by using… applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing SSR 06-03p, additional citation omitted).  Applying those factors, Plaintiff maintains that both Ms. Wilson and Ms. Harkenrider were the more qualified sources to evaluate the severity of her limitations.

But neither the applicable regulations nor SSR 16-03p mandate any express articulation of how an ALJ considers the cited factors.[10] Instead, SSR 06-03p explains that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." *Id*., 2006 WL 2329939 at *6.  Accordingly, SSR 06-03p no more than suggests that an ALJ "should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence… allows a claimant or subsequent reviewer to follow the adjudicator's reasoning," *see id*., 2006 WL 2329939 at *7; *see also*, *Hickox v. Com'r of Soc. Sec.*, 2010 WL 3385528 at *6 (W.D. Mich. Aug. 2, 2010, adopted by 2011 WL 6000829 (W.D. Mich. Nov. 30, 2011) (holding that while information from "other sources" must be "considered,"

---

[10]Citing to regulations that apply to claims filed *after* March 27, 2017, Plaintiff argues that if only she had filed her claim at a later date, her Nurse Practitioner would have qualified as an acceptable medical source. However, those new regulations are not retroactive.  This Court is limited to the application of the regulations that apply to this case.

an ALJ is not required to discuss those opinions or explain the evidentiary weight assigned thereto.).

Here, the ALJ's discussion of the two treating sources went well beyond what SSR 06-03p and the relevant regulations require. In fact, the ALJ explained that he was not relying solely upon their "status" as less qualified "other" medical sources, but was discounting their opinions based upon the lack of support and internal inconsistencies as well as inconsistencies between their opinions and other evidence of record. For example, the ALJ explained his concerns with Ms. Wilson's opinions as follows:

> Ms. Wilson's opinion, which suggests no useful ability to function in most factors, is inconsistent with her conclusion that the claimant was able to function well enough to manage her own benefits (Exhibit 12F/7). Furthermore, the claimant's treatment notes, both from Ms. Wilson and from other providers throughout the record, do not support such excessive limitations (Exhibits 1F-17F). For example, in April 2019, Ms. Wilson's treatment notes specifically state that volunteering "might be feasible," and indicated it was physical, not mental, problems that prevented the claimant from working, which is entirely inconsistent with the excessive limitations reflected in Ms. Wilson's opinion (Exhibit 11F/8). Ms. Wilson's opinion is not consistent with other evidence in the record. For example, the claimant demonstrated significantly better functioning on her psychological consultative examination (Exhibit 6F). Even her mental functioning during more intensive treatment reflects substantially better mental functioning than opined by Ms. Wilson (e.g. Exhibit 10F). Though there were sometimes limitation in insight and judgment, the claimant generally presented as adequately groomed, pleasant, and cooperative with good eye contact (e.g. Exhibit 10F/7). Thought processes were coherent, linear, logical, and goal-directed with no looseness of associations or flight of ideas, and associations were intact (e.g. Exhibit 10F/7). She denied any abnormalities in thought content (e.g. Exhibit 10F/7). Her attention and concentration were intact while recent, short-term, and long-term memory were considered good (Exhibit 10F/7, 23). Accordingly, Ms. Wilson's opinion is generally inconsistent with and unsupported by the record and is afforded little weight. However, her opinion was nevertheless given some slight deference, as the undersigned found the claimant more limited than opined by non-treating sources.

(Tr. 39-40).

Plaintiff asserts that the ALJ's comments at the hearing gave the impression that Ms. Wilson's opinion "'would suffice' to prove Plaintiff's disability" if she "had the status" as an "acceptable" medical source.  (Doc. 9 at 8 citing Tr. 40-41).  Having reviewed the referenced colloquy, the undersigned disagrees.   During Plaintiff's opening statement, counsel urged the ALJ to accept "the residual functional capacity ratings given by [Ms. Wilson]… and award at step five."  (Tr. 56).  In response, the ALJ inquired if the RFC statement was "signed by an acceptable medical source?"  Plaintiff's counsel responded negatively, explaining that a "licensed social worker," is "all I've got."  (*Id.*)

The ALJ then went on to state that he had considered the statement by one of the *acceptable* medical sources, Dr. Halmi, that Plaintiff's "prognosis is poor." (Tr. 58). However, the ALJ noted that he had also "highlighted" the fact that Dr. Halmi had made "no findings" to support disability.  (*Id.*)   After reiterating that Ms. Wilson is *not* an acceptable medical source under the operative regulations, the ALJ stated:

> I've had this [issue] before and so I've always just said, well, look, can't you go out and just have a doctor at the facility sign off on it and it comes back a doctor has looked [at] it and has signed off.  I don't know about this facility.

(Tr. 58).

The ALJ explained that because he still had questions about formulating Plaintiff's mental RFC that were not answered by Ms. Wilson's opinions, he had decided to request "completion of a medical source statement" by an acceptable medical source (a reviewing medical expert).  (Tr. 59).   Explaining his decision, the ALJ commented: "I thought you might have a[n acceptable medical source] statement that would answer [my] questions." Plaintiff's counsel responded "we were hoping 12F would suffice…."  The ALJ disagreed, adding that "[i]t would if I gave her a status that she doesn't have." (Tr. 59-60).  In context, the ALJ's comments are reasonably interpreted as highlighting that there was no qualified

18

"medical opinion" (as defined under then-applicable regulations) by an "acceptable medical source" to assist in formulating the mental RFC because the only evidence offered by Plaintiff was an opinion from an "other" source.

Plaintiff's hypothesis that the ALJ would have found her to be disabled based upon Ms. Wilson's opinions if only she were an "acceptable medical source" overstates and/or misconstrues the record. But even if the ALJ gave Plaintiff the impression that he would have given greater weight to the social worker's opinions if she were an acceptable medical source, the Court finds no reversible error. As discussed, affording a different weight based upon status is permissible. In addition, only a written opinion is appealable.[11] Following a hearing, an ALJ has time to reassess the record more closely in light of the testimony and all exhibits presented. In the ALJ's post-hearing written analysis, the ALJ pointed out multiple inconsistencies between Ms. Wilson's opinions and the record that supported giving her opinions little weight.

With respect to Ms. Harkenrider's opinions, which focused on a combination of physical and mental impairments, the ALJ wrote:

> Ms. Harkenrider recommended disability so that "healthcare professionals can continue to monitor" the claimant (Exhibit 16F/1). With respect to her mental impairments, Ms. Harkenrider stated that any work environment "could" trigger a manic episode (Exhibit 16F/1). She opined the claimant was able to lift ten pounds frequently (Exhibit 16F/2). Ms. Harkenrider stated the claimant was able to stand and/or walk for one hour before back pain occurs, but she limited her to standing and/or walking both for one hour at a time and without interruption, which is internally inconsistent (Exhibit 16F/3). She opined the claimant had no limitations with sitting (Exhibit 16F/3). Ms. Harkenrider opined the claimant was limited to no to occasional postural activities, amending the definition of occasional to less than one hour (Exhibit 16F/3). Ms. Harkenrider opined the claimant had environmental limitations because of her mental impairments and migraines (Exhibit 16F/4). She further opined the claimant would only be able to work

---

[11]Plaintiff cites to no authority that holds that an ALJ should be bound by an indirect oral statement made at a hearing prior to the publication of a formal written opinion.

> for more than an hour at a time and would be unable to return to work after a break (Exhibit 16F/7). She suggested that the claimant would need to lie down daily (Exhibit 16F/7). Ms. Harkenrider further opined the claimant was incapable of even "low stress" jobs and would be absent more than four days per month (Exhibit 16F/8).

(Tr. 40).

The ALJ went on to criticize Ms. Harkenrider's opinion that Plaintiff could not "hold a steady job," as "an issue reserved to the Commissioner." (*Id.*)  *See also, generally*, *Vance v. Com'r of Soc. Sec.*, 2008 WL 162942 at *3 (6th Cir. 2008).  But that was not all. The ALJ explained that Ms. Harkenrider's opinions generally were unsupported by and inconsistent with the record.

> In addition to being internally inconsistent, Ms. Harkenrider's opinion related to both the claimant's physical and mental capabilities are generally not supported by or consistent with the record (Exhibits 1F-17F). With respect to the physical limitations, the claimant's relatively normal imaging studies do not support her extreme limitations (e.g. Exhibits 7F/83, 86; 9F/28, 107-109; 15F/172-173). While her pain management notes reflect some reduced strength, particularly in the left lower extremity, it was still at least fair, suggesting the claimant was able to meet the lifting requirements of light work (e.g. Exhibit 7F/52). The lack of notations related to use of assistive devices throughout most of the record further demonstrates greater functioning than opined (Exhibits 1F-17F). With respect to Ms. Harkenrider's opinion related to mental functioning, the claimant demonstrated significantly better functioning on her psychological consultative examination than opined by Ms. Harkenrider (Exhibit 6F). Her most recent treatment notes reflect that she was well -groomed with appropriate eye contact and cooperative behavior, and she presented with normal memory (e.g. Exhibits 9F/57 and 11F/14). Even her mental functioning during more intensive treatment reflects adequate mental functioning (e.g. Exhibit 10F). Though there were sometimes limitations in insight and judgment, the claimant generally presented as adequately groomed, pleasant, and cooperative with good eye contact (e.g. Exhibit 10F/7). Thought processes were coherent, linear, logical, and goal-directed with no looseness of associations or flight of ideas, and associations were intact (e.g. Exhibit 10F/7). She denied any abnormalities in thought content (e.g. Exhibit 10F/7). Her attention and concentration were intact while recent, short[-]term, and long-term memory were considered good (Exhibit 10F/7, 23). Therefore, Ms. Harkenrider's opinion is generally inconsistent with and unsupported by the record and is given little weight. However, her opinion was given some slight deference, as the undersigned found the claimant more limited than opined by non-treating sources.

20

(Tr. 40-41).

Plaintiff complains that Ms. Harkenrider's internally inconsistent statements "do not prove that [Plaintiff] could do full-time work." (Doc. 9 at 9).  But the ALJ never suggested that was the case; rather, he pointed to the inconsistencies as one of multiple reasons for giving her "disabling" opinions "little weight."  In short, the ALJ provided an expansive analysis of both opinions by treating providers who did not qualify as acceptable medical sources.  That analysis reflects no factual or legal error and is substantially supported.

### III.  Conclusion and Order

For the reasons stated, the ALJ's assessment of the evidence and formulation of Plaintiff's RFC in this case are substantially supported.  Accordingly, **IT IS ORDERED THAT** the decision of the Commissioner to deny Plaintiff DIB benefits be **AFFIRMED** because it is supported by substantial evidence in the record as a whole.


 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

21